{¶ 10} I respectfully dissent. Brian R. Nobbs, D.C., who, for a period of time was both Kristen Kestler's treating physician and her employer, certified a period of entitlement to temporary total disability ("TTD") compensation from October 11, 2005 to March 1, 2006. Dr. Nobbs was in a position to know the details of why Kristen Kestler, who *Page 5 
attempted to return to work for him, was able to last only eight days before she satisfied him that she was unable to do the job and hence was entitled to TTD compensation.
 {¶ 11} Douglas C. Gula, D.O., did not see Kristen Kestler until after the March 1, 2006 date certified by Dr. Nobbs. Therefore, I do not see Dr. Gula's opinion as being some evidence to refute the opinion of Dr. Nobbs. Stated differently, the Industrial Commission could not rely on the opinion of Dr. Gula to deny TTD compensation.
 {¶ 12} Earl Scheidler, D.O., became Kristen Kestler's treating physician on October 20, 2005, partway through the period of disability certified by Dr. Nobbs. Dr. Scheidler gave her an injection in her back and prescribed both a narcotic medication and a non-narcotic medication for her pain. These are not the acts of a physician who believes that an injured worker should immediately go back to her former employment.
 {¶ 13} On October 24, 2005, Dr. Scheidler saw Kristen Kestler again. He continued her on her medication and asked her to bring in the results of her earlier MRIs so he could decide whether to have surgery performed or to continue conservative treatment. Again, these are not the acts of a physician who is saying that the patient should already be back at her former job.
 {¶ 14} Kristen Kestler saw Dr. Scheidler again on November 3, 2005. She was using Vicodin, a narcotic pain reliever, to relieve her pain. Dr. Scheidler discussed referring her to a pain center for longer term pain management and possible epidural injections. He refilled her prescriptions.
 {¶ 15} Dr. Scheidler then encouraged Kristen to return to work. In his words, "I have encouraged her that I feel like her getting back into work would be appropriate." Kristen did not openly disagree with her doctor, but said she could not go back to work, blaming a lack of babysitting for her infant. Her failure to confront her doctor and disagree *Page 6 
with his opinion does not constitute proof that Kristen felt she could return to her former position of employment.
 {¶ 16} Putting all this together, I do not see "some evidence" to deny TTD compensation for the period of time certified by Dr. Nobbs.
 {¶ 17} I would sustain the objection to the magistrate's decision and issue a writ compelling an award of TTD compensation from October 11, 2005 to March 1, 2006. Since the majority does not do so, I respectfully dissent. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION Rendered on August 23, 2007 IN MANDAMUS {¶ 18} In this original action, relator, Kristen Kestler, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her temporary total disability ("TTD") compensation beginning October 11, 2005, and to enter an order granting said compensation.
Findings of Fact: *Page 8 {¶ 19} 1. On March 10, 2003, relator sustained an industrial injury while employed as a physical therapist for respondent Wellness Center Health Associates, a state-fund employer. On that date, relator experienced pain in her lower back and her right thoracic region as she was assisting a patient from a treatment bed.
 {¶ 20} 2. Pursuant to the employer's certification, the industrial claim was initially allowed for "thoracic sprain; lumbar sprain," and was assigned claim number 03-812491.
 {¶ 21} 3. On the date of injury, relator was examined by chiropractor Brian R. Nobbs, D.C., an employee of Wellness Center Health Associates. In a report dated March 10, 2003, Dr. Nobbs wrote: "Treatment in this office will consist of conservative chiropractic spinal correction, chiropractic physical therapy and observation with decreasing in frequency as the patient's condition allows."
 {¶ 22} 4. On February 9, 2005, Dr. Nobbs wrote:
 * * * [T]here is a high degree of medical probability that the 03/10/2003 work injury caused 722.52 aggravation of preexisting lumbar degenerative disc disease and 721.3 aggravation of pre-existing lumbar spondylosis and aggravated any pre-existing degenerative changes in those areas. Based upon a high degree of medical certainty, the additional recommended diagnoses are a result of a progression of the 03/10/2003 industrial accident.
 {¶ 23} 5. On August 3, 2005, relator moved for the allowance of additional conditions in the claim.
 {¶ 24} 6. Following a September 20, 2005 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "aggravation of pre-existing lumbar degenerative disc disease and aggravation of pre-existing lumbar spondylosis" based upon Dr. Nobbs' February 9, 2005 report. Apparently, the DHO's order was not administratively appealed. *Page 9 
 {¶ 25} 7. On October 31, 2005, Dr. Nobbs completed a C-84 certifying a period of TTD from October 7, 2004 to an estimated return-to-work date of October 2, 2005.
 {¶ 26} 8. On November 1, 2005, relator moved for TTD compensation.
 {¶ 27} 9. Following a December 19, 2005 hearing, a DHO awarded TTD compensation for a closed period from October 7, 2004 to October 1, 2005 based upon Dr. Nobbs' C-84 and his office notes. The DHO's order "further finds that the injured worker returned to work on 10/03/2005."
 {¶ 28} 10. The Ohio Bureau of Workers' Compensation ("bureau") administratively appealed the DHO's order of December 19, 2005.
 {¶ 29} 11. Following a January 27, 2006 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order of December 19, 2005.
 {¶ 30} 12. Earlier, on October 20, 2005, relator became a new patient of and was initially examined by Dr. Scheidler. On that date, Dr. Scheidler wrote:
 * * * BWC New patient visit. She is in today [complaining of] bilateral lower back pain for several years. * * * She states this low back and D spine bothers her every day but is worse on an intermittent basis and with more activity. She states that she wants to find some kind of pain relief but is having great difficulty getting any significant pain relief without some kind of even light narcotic. She states the TENS units that she has do help when she has them on, although she still has significant pain.
 * * *
 * * * We are going to do a 1:1:8 inj into the L LSSI. Patient's pain and movement was significantly improved subjectively following the inj which she tolerated well. We are going to have her continue Motrin 800 mg tid and also Lortab 5/500 1 qoh prn pain (to be used sparingly). She is to use her TENS unit. * * *
 {¶ 31} 13. On October 24, 2005, Dr. Scheidler wrote: *Page 10 
 * * * In for recheck of low back pain. Was significantly improved for two days status post injection. Now it's sore again but less so then before the injection. She [complained of] new onset left heel pain.
 DX: 1. L pain. 2. LSSI strain/sprain. 3. L sprain.
 TX: We told her mentally she needs to try to get over this as much as possible. She states the TENS unit works well for her, although she chooses not to use it much. We urged her to do so. We also stated that, although we will give her some narcotic type pain medications for pain control, if she abuses these in any way, we will refer her to the pain clinic and [discontinue] writing these. We stressed that mentally she needs to get on with her life and get back into working and that she may never be totally pain-free and that she very carefully has to watch the amount of narcotics she uses for not only a physiologic but psychologic addiction and an increased tolerance standpoint. Will give her Lortab 7.5 which historically have better-controlled her low back pain. She will use these on a very spring [sic] basis and alternate them with the Lortab 5. * * *
 {¶ 32} 14. On November 3, 2005, Dr. Scheidler wrote:
 * * * In today for recheck of her mid D and L pain. She has had no more shooting pain down her right leg since receiving the injection. States she is using the TENS unit occasionally, but she is having to use more of the Vicodin 7.5 than she thought. She states that the Motrin 800 doesn't do much.
 * * *
 DX: 1. L D somatic dysfunction. 2. LSSI sprain. 3. L pain, chronic.
 TX: We discussed referring her to Dr. Neil Jobalia, at the pain center, for longer term pain management f/u and possible epidural injections. She will have her MRI faxed to us today. We are refilling her Lortab 7.5/500 and have instructed her to use both her TENS unit and her Motrin. I have encouraged her that I feel like her getting back into work would be appropriate and, in my opinion and hers, as we discuss it, she feels that she could go back to work only she has no one to watch the baby. * * * *Page 11 
 {¶ 33} 15. On January 30, 2006, Dr. Nobbs competed another C-84 certifying TTD from October 11, 2005 to an estimated return-to-work date of March 1, 2006. On the C-84, Dr. Nobbs listed January 27, 2006 as the date of last examination or treatment.
 {¶ 34} 16. On January 30, 2006, relator moved for TTD compensation based upon Dr. Nobbs' C-84. The motion asserted "claimant tried to return to light duty work but was unable to continue due to her allowed injuries."
 {¶ 35} 17. On March 8, 2006, at the bureau's request, relator was examined by Douglas C. Gula, D.O. In a four-page report, Dr. Gula wrote:
 The ICD-9 codes allowed in this claim are:
 847.1 Sprain thoracic region
 847.2 Sprain lumbar region
 721.3 Lumbosacral spondylosis
 722.52 DDD L5-S1
 The following questions will be answered:
 * * *
 2) Based on your review of the medical records and information you obtained from your evaluation of the injured worker, are there additional diagnostic or treatment services consistent with nationally accepted treatment guidelines that should be considered that would be reasonabl[y] expected to improve the treatment outcomes of the allowed condition(s) in this claim?
 I do not believe that any diagnostic studies should be performed as related to the above mentioned patient. The patient did indeed undergo an MRI scan of the thoracic and lumbar spine. It should be noted that the MRI of the thoracic spine is very much normal. The MRI of the lumbar spine demonstrated evidence of disc dessication L5-S1. I am not convinced that this is an abnormal finding considering the nature of her occupation. I do not believe there is any evidence of DDD or lumbar spondylosis as related to the above mentioned patient. Thus, I am of the opinion that these studies need to be performed. I do not find any signs *Page 12 
of radiculopathy and thus do not believe that further evaluation is necessary.
 3) Based on your review of the medical records and information you obtained from your evaluation of the injured worker, what activity (including work) restrictions/limitations appear to be appropriate based upon the current status of the allowed condition in the claim.
 I do believe the patient is capable of performing a light to sedentary type of occupation. I do not see any limitation with regards to function of the upper and lower extremities. She will alternate between sitting, standing and walking. I would discourage from climbing. Restrictions of weight would be approximately 20 lbs. lifting and 10 lbs. carrying. She will only be able to utilize 20 lbs from a push or pull standpoint. Otherwise, I do not believe there are any limitations as related to the upper extremity function.
 4) In your medical opinion, has the injured worker reached MMI [maximum medical improvement]?
 Yes, I believe the patient has reached MMI. I do not believe there will be any change with regards to the patient's condition. Thus, I do not believe that the current treatment is necessary as related to the above mentioned patient.
 5) If the injured worker has not reached MMI, is vocational rehabilitation appropriate from a medical perspective?
 I do believe the patient does indeed need an extensive course of rehabilitation. She is definitely in desperate need of a work conditioning and subsequently a work hardening program. Finally a FCE should be performed in the end to determine the exact capabilities of the patient. I believe that a work condition — work hardening program is absolutely essential in order to allow the patient to return to gainful employment.
 6) The IC granted TT compensation from 10/07/2004 to 10/01/2005 at a hearing held 01/27/2006. The claimant completed a request for TT on 01/27/2006 for compensation from 10/11/2005 and continuing. Does file medical support the new request for compensation beginning 10/11/2005?
 No
 {¶ 36} 18. On April 5, 2006, the bureau moved to terminate TTD compensation. *Page 13 
 {¶ 37} 19. On May 16, 2006, a DHO heard relator's January 30, 2006 motion for TTD compensation and the bureau's April 5, 2006 motion to terminate TTD compensation. Following the hearing, the DHO issued an order granting TTD compensation beginning October 11, 2005 based upon Dr. Nobbs' C-84s and terminating TTD compensation as of the hearing date based upon Dr. Gula's opinion that the industrial injury had reached MMI.
 {¶ 38} 20. Both the bureau and relator administratively appealed the DHO's order of May 16, 2006.
 {¶ 39} 21. Following a July 6, 2006 hearing, an SHO issued an order that vacates the DHO's order of May 16, 2006. The SHO's order states:
 It is the order of the Hearing Officer that the C-86 motion, filed by the injured worker on 01/30/2006, is denied. The motion requested the payment of temporary total disability compensation beginning on 10/11/2005 to the present and continuing.
 The Hearing Officer finds that the injured worker was not temporarily and totally disabled as a result of the allowed conditions in the claim beginning on 10/11/2005. In making this finding, the Hearing Officer relies upon the opinion of Dr. Douglas Gula, set forth in a report dated 03/08/2006. Dr. Gula opined that the medical evidence did not support the requested period of temporary total disability compensation. There is no treatment note indicating the reason that the injured worker went off work on 10/11/2005. The treatment notes in file from October and November 2005 indicate a notation from the physician that the injured worker "feels that she can go back to work only she has no one to watch the baby."
 The Hearing Officer finds that a review of the treatment notes contemporaneous with the requested start date of temporary total disability compensation corroborate[s] the opinion of Dr. Gula that the requested period of temporary total disability compensation is not supported. Therefore, the Hearing Officer orders that the request for temporary total *Page 14 
disability compensation from 10/11/2005 to the present and continuing be denied.
 This order is based upon the independent medical exam from Dr.Gula dated 03/08/2006 and the office records in file from Dr. Scheidler.
 {¶ 40} 22. On September 9, 2006, the three-member commission mailed an order refusing relator's administrative appeal from the SHO's order of July 6, 2006.
 {¶ 41} 23. On January 18, 2007, relator, Kristen Kestler, filed this mandamus action.
Conclusions of Law: {¶ 42} The issue is whether the commission stated a valid basis supported by some evidence for rejecting Dr. Nobbs' C-84 certification of TTD beginning October 11, 2005.
 {¶ 43} Finding that the commission did state a valid basis supported by some evidence for rejecting Dr. Nobbs' C-84 certification of TTD beginning October 11, 2005, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 44} The SHO's order of July 6, 2006 initially states reliance upon Dr. Gula's opinion that the medical evidence of record does not support TTD compensation.
 {¶ 45} Later in the order, the SHO found that "a review of the treatment notes contemporaneous with the requested start date of temporary total disability compensation corroborate[s] the opinion of Dr. Gula that the requested period of temporary total disability compensation is not supported." The order states reliance upon "the office records in file from Dr. Scheidler." *Page 15 
 {¶ 46} Thus, the order of July 6, 2006 indicates that, based upon the SHO's own review of Dr. Scheidler's treatment notes, she determined, as did Dr. Gula, that TTD is not supported by the contemporaneous office notes. The SHO was particularly persuaded by Dr. Scheidler's November 3, 2005 office note stating: "I have encouraged her that I feel like her getting back into work would be appropriate and, in my opinion and hers, as we discuss it, she feels that she could go back to work only she has no one to watch the baby."
 {¶ 47} Dr. Scheidler's November 3, 2005 written notation of relator's admission is clearly some evidence upon which the commission can and did rely.
 {¶ 48} Moreover, the SHO was also persuaded by the absence of a treatment note indicating the reason that relator "went off work on 10/11/2005." The DHO's order of December 19, 2005 that was administratively affirmed, found that relator "returned to work on 10/03/2005." On his C-84, Dr. Nobbs certified relator to be temporarily totally disabled beginning October 11, 2005, just eight days after her failed return to work, yet there is no treatment note from Dr. Nobbs explaining why relator was allegedly unable to continue her employment. Where a key question is left unanswered, the commission is entitled to conclude that a medical report's persuasiveness is either diminished or negated. State ex rel. Pavis v. Gen. Motors Corp., B.O.C. Group (1992),65 Ohio St.3d 30.
 {¶ 49} Based upon the above analysis, the commission has stated a valid basis supported by some evidence for rejecting Dr. Nobbs' C-84 certification of TTD beginning October 11, 2005. Under such circumstances, this court need not determine whether Dr. Gula's report is some evidence upon which the commission can rely. *Page 16 
 {¶ 50} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1